# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

ELDORA PRINCE, and
NGCOBA ATKINS,

                                    Plaintiffs,

        v.                                                    6:16-CV-440
                                                             (DNH/ATB)

DEP'T OF SOCIAL SERVICES OF
ONEIDA COUNTY, et al.,

                                    Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

ELDORA PRINCE, Plaintiff pro se
NGCOBA ATKINS, Plaintiff, pro se

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court a complaint, filed on a form for civil rights

actions pursuant to 42 U.S.C. § 1983, together with an application to proceed in forma

pauperis ("IFP"), filed by pro se plaintiffs Eldora Prince and Ngcoba Atkins. (Dkt. Nos.

1, 2).

## I.    IFP Application

Plaintiffs appear to be a married couple. They have filed only one application for

IFP status. Technically, each plaintiff should have completed his or her own form

because they are separate plaintiffs for this action.[1] However, because they have each

signed the application individually, the court will excuse the technical error. A review

---

[1] It is well-settled that a person who has not been admitted to practice law may not represent anyone other than himself or herself. *Lattanzio v. COMTA*, 481 F.3d 137, 139-40 (2d Cir. 2007). *See also* 28 U.S.C. § 1654. An limited exception exists if an individual appears for an estate in which there are no other beneficiaries or creditors. *See Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010). The exception is not applicable to this case.

of the IFP applications shows that the plaintiffs are not able to afford to pay the filing fee. Thus, the court will assume for purposes of this Order and Report-Recommendation that, together, and separately, plaintiffs meet the financial criteria for IFP.

In addition to determining whether plaintiffs meet the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i) -(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

2

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiffs' complaint under the above standards.

## II. Complaint

The plaintiffs' complaint is disjointed and vague, but the court will attempt to interpret it as liberally as possible to determine whether the complaint state any claims for relief.[2] *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein). Plaintiffs allege that in August of 2014, the Department of Social Services ("DSS") terminated their "public assistance" benefits, using the wrong numbers to determine eligibility. (Complaint ("Compl.") ¶ 4(a)) (Dkt. No. 1). Plaintiffs allege that they were denied a conference to "get clarification" of this decision, so they filed for a "fair hearing." (Compl. ¶ 4(b)).

Plaintiffs claim that they requested "files and information" in order to prepare for

---

[2] This task is more difficult because plaintiffs do not separate their factual statements from their "causes of action." Their factual statements are sprinkled with words indicating legal claims such as "negligence," "retaliation," and "official misconduct," but plaintiffs list only three causes of action on their complaint form. (*Compare* Compl. ¶¶ 4(a)-4(v) *with* Compl. ¶ 5). They appear to be complaining about various types of benefits being terminated or delayed at various times, together with multiple "fair hearings" that were held as a result of the agency action. The court will attempt to interpret the entire complaint for all possible claims.

the hearing, but on September 27, 2014, the New York State Office of Temporary Disability Assistance ("NYSOTDA") "fraudulently" sent them an "account transaction history" for their Electronic Benefits Transfer ("EBT") account which indicated that plaintiffs received more benefits than they actually received. (Compl. ¶ 4(c)). Plaintiffs claim that this indicates that the NYSOTDA "falsified records." (*Id.*)

Although plaintiffs claim that they were granted "aid to continue"[3] until the fair hearing decision, on November 5, 2014, DSS canceled their "medical benefits," prior to the fair hearing decision. (Compl. ¶ 4(d)). Plaintiffs allege that DSS failed to make timely rental payments for September and October of 2014, and when their rent was not paid in November of 2014, plaintiffs inquired at the Oneida County Office Building and were told that the payment should be received by the landlord by November 17, 2014. (*Id.*) Plaintiffs allege that the rent for November and December was not actually paid until December 4, 2014. (*Id.*)

Plaintiffs allege that on December 9, 2014, they called to get their Food Stamp ("FS") balance and transactions from the automated EBT line, but noticed a "falsely reported deposit of $357 on Nov[ember] 21, 2014," which the plaintiffs state that they never received. (Compl. ¶ 4(e)). Plaintiffs allege that this shows "falsified records" and "fraud." Plaintiffs allege that the fair hearing[4] was adjourned on December 20, 2014 because they were not granted access to the case file prior to the hearing. (Compl.

---

[3] It is unclear whether these "medical benefits" were the same, or part of the "public assistance" benefits that were the subject of the August 2014 decision discussed in paragraph 4(a).

[4] The court assumes that this "fair hearing" is still referring to the hearing that was requested as a result of the August 2014 determination discussed in paragraph 4(a).

¶ 4(f)).  Plaintiffs state that the fair hearing was held on December 31, 2014, after they were granted access to the files.  As a result of the hearing, "Plaintiffs agreed to the calculated income determination by DSS." (Compl. ¶ 4(g)).  But plaintiffs appear to allege that the ultimate determination to terminate benefits was incorrect because defendant Brian Kirley incorrectly believed that plaintiffs were not entitled to the "higher level of allowance for a family with a person with a disability."[5] (*Id.*)  Plaintiffs also appear to claim that on May 20, 2015, they filed an Article 78[6] proceeding challenging this decision. (*Id.*)

Plaintiffs also claim that their Supplemental Nutrition Assistance Program ("SNAP") benefits were "canceled/delayed" for the months of December and January, notwithstanding the "aid to continue" directive. (Compl. ¶ 4(h)).  Plaintiffs allege that on January 2, 2015, "Judy"[7] from the Commissioner's office stated that she would no longer provide "accommodations" to plaintiffs, and that defendant Brian Kirley should "never have allowed them in the past." (Compl. ¶ 4(i)).  "Judy" also denied the plaintiffs an "ADA Grievance" form so that plaintiffs could file a discrimination claim, but told them that they could write their complaint on blank paper, and it would be

---

[5] The court has interpreted plaintiffs' statement to mean that, although they "agreed" to the DSS calculation of their income, they believed that because one of the plaintiffs is "disabled," they were allowed to have a higher income and still be eligible for "public assistance."

[6] N.Y. Civ. Prac. L. & R. § 7801 et seq.   Article 78   is "an amalgam of the common law writs of certiorari to review, mandamus, and prohibition, [and] provides both a hearing and a means of redress for petitioners." *Hellenic Am. Neighborhood Ac. Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996).

[7] "Judy" is not named as a defendant in this action, and although her last name is not listed in paragraph 4(i), "Judy Graziano" is mentioned in paragraph 4(j).  The court assumes, but cannot be certain, that it is the same "Judy."

directed to the appropriate department, but plaintiffs never got a response. (*Id.*) Plaintiffs allege that this conduct constitutes "fraud" and "official misconduct." (*Id.*)

Plaintiffs allege that on January 29, 2015, a hearing was held for "overpayment recoupment." (Compl. ¶ 4(j)). Apparently, the notice of the hearing was improper, and the hearing was rescheduled for February 1, 2015, but the hearing was adjourned again "for denial of access to [the] file again." (*Id.*) Judy Graziano refused to answer any questions about the file when the plaintiffs were finally granted access on February 4, 2015. Although it is unclear, it appears that plaintiffs claim that when they told Ms. Graziano that someone was supposed to be present to answer questions and requested Brian Kirley's presence, Judy "then collected" the files that plaintiffs had separated for copying and left the room with them, "resulting in incomplete access to [the] files." (*Id.*) Plaintiffs then claim that Brian Kirley "did not comply with orders of the fair hearing officer [who] adjourned the 1/29/15 hearing." Plaintiffs state that this "negligence and unequal protection of the law." (*Id.*)

Plaintiffs allege that they were denied due process when DSS began deducting the overpayment from their benefits on December 20, 2015, when the fair hearing was not held until December 31, 2015, and no decision had been made. (Compl. ¶ 4(k)). It is unclear whether the dates are correct in this paragraph because plaintiffs then state that they discussed this at the February 11, 2015 hearing. (*Id.*) Plaintiffs may be referring to the December 31, 2014 hearing that they discussed in paragraph 4(g) above.

Plaintiffs state that they requested a "fair hearing" on February 12, 2015 on the issue of "reduction of benefits," and NYSOTDA attempted to have the hearing held in

Fulton County instead of Oneida County "in retaliation for the number of hearings" and "negligence." (Compl. ¶ 4(l)). Plaintiffs claim that on March 27, 2015, they were denied "eligible Heap services,"[8] which induced a "panic attack in DSS."[9] (Compl. ¶ 4(m)). As a result of the panic attack, "Judy" called the Sheriff and had plaintiffs escorted out of the building, even though the plaintiffs "had not completed their business." (*Id.*) Although plaintiffs were attempting to write a complaint about their HEAP benefits, they were threatened with arrest for trespassing if they returned to the DSS office. Plaintiffs claim that this was "wrongful" and "tortuous" conduct, amounting to "official misconduct." (*Id.*)

Plaintiffs claim that during this incident, the Oneida County Sheriff's Officers who responded to the call verbally harassed plaintiffs, made fun of them, and tried to force plaintiffs into the elevator with their hands on their weapons. (Compl. ¶ 4(n)). Plaintiffs allege that this amounts to "undue burden" and "official misconduct." (*Id.*) On the same day, plaintiffs allege that a HEAP staff member, Julie Labella, made a false report, indicating that plaintiffs had been "rude" and that they had been to the office "the last 3 days." (Compl. ¶ 4(o)). As a result, plaintiffs complained about the staff of HEAP, claiming that Ms. Labella falsified records, committed "official misconduct," and engaged in "retaliation," although Ms. Labella has not been named as a defendant in this action. (*Id.*)

---

[8] "HEAP" stands for the Home Energy Assistance Program.

[9] Plaintiffs do not indicate which one of them had the panic attack.

Plaintiffs then claim that, at a June 1, 2015 hearing[10] on the validity of the overpayment, DSS "agreed to [a] stipulation of debt of $1388 [instead of] $1408 . . . ." (Compl. ¶ 4(p)). However, DSS then proceeded to attempt to collect the entire amount in "breach of contract." (*Id.*) Plaintiffs state that they had another hearing scheduled for June 30, 2015, but it had to be rescheduled due to "faulty notice" and "negligence." (Compl. ¶ 4(q)).

A hearing was held on August 18, 2015, based on plaintiffs' challenge to the denial of SNAP benefits based on "excess income." (Compl. ¶ 4(r)). As a result of the hearing, the termination of benefits was upheld, and plaintiffs were found ineligible for SNAP benefits. (*Id.*) Plaintiffs allege that they were denied equal protection because DSS staff would not apply "06ADM05"[11] to their case in violation of the Americans with Disabilities Act ("ADA")[12] and Rehabilitation Act ("RA")[13]. (*Id.*) Plaintiffs claim that the defendants retaliated against them by denying them eligibility for benefits based on all the complaints that plaintiffs made against "them." (*Id.*)

Plaintiffs allege that in September of 2015, the NYSOTDA, "in collaboration with Oneida County [DSS]" sent plaintiffs a notice, stating NYSOTDA's intent to "take

---

[10] There appear to have been multiple hearings for multiple reasons and types of benefits.

[11] 06-ADM-05 is an "Administrative Directive" issued by the NYSOTDA to "Local Commissioners" from the "Division of Employment and Transitional Supports." The "subject" of the directive is listed as "Providing Access to Temporary Assistance Programs for Persons with Disabilities and/or Limited English Proficiency (LEP)." The directive is approximately twenty pages long.

[12] 42 U.S.C. § 12101 et seq.

[13] Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

action for the overissuance [sic] of benefits from Sept [sic] to Dec [sic] 2014 of $1408."

(Compl. ¶ 4(s)).  Plaintiffs state that, at the time they received the notice, DSS had

already begun to recover the overpayment by way of a monthly deduction of thirty-six

dollars from plaintiffs' SNAP benefits between March 29, 2015 until the last time they

received benefits in June 2015. (*Id.*)  Plaintiffs also allege that, even after they stopped

receiving SNAP benefits, they continued to make three payments of twenty dollars each

toward the overpayment amount.  Plaintiff's allege "misrepresentation," "attempt fraud

in the inducement [sic]," and "embezzlement." (*Id.*)

Plaintiffs alleges that on November 16, 2015, they requested review by mail "to

Treasury Offset Program." (Compl. ¶ 4(t)).  Plaintiffs allege that they submitted reasons

and documentation, "explaining why the debt was invalid." (*Id.*)  Plaintiffs state that on

March 14, 2016, Laura Mathews, the "NYS OTDATOP Coordinator" responded "with

review results indicating that the claim will no longer be submitted to TOP for

collections." (*Id.*)  This statement may indicate that plaintiffs won their appeal.

However, plaintiffs state that on March 9, 2016, the Oneida County DSS sent plaintiffs

a notice, indicating "an intent to take action on [the] collection of [the] $1408"

overpayment for "ineligible" benefits for September 2014 to December 2014.  Plaintiffs

claim that this notice constitutes "Harassment" and "Fraud in the Inducement." (Compl.

¶ u)).  Plaintiffs claim that they believe that the NYSOTDA and the Oneida County

OTDA "colluded knowingly" in activities that would violate the plaintiffs

constitutional rights, "by collectively working to . . . purge eligible recipients from

benefit roles by not providing equal protection of the laws." (Compl. ¶ 4(v)).

Plaintiffs list three "Causes of Action:" (Compl. ¶ 5).

(1)    Plaintiffs seek damages for procedural due process violations because they were denied their "liberty interest in a good name and reputation and continued enrollment in eligible programs. Plaintiffs also claim that defendants discriminated against them based on their race.

(2)    DSS violated the ADA and the RA by its "pattern and practice of discriminatory and retaliatory acts and omissions." Plaintiffs allege that plaintiff Eldora Prince is disabled "within the meaning of the act," and "her request for reasonable accommodations constitutes protected activity under the act."

(3)    Oneida County violated provisions of Administrative Directive "06-ADM-05" and Title II of the ADA.[14] DSS staff and "faculty have engaged in activities to directly single out plaintiffs by not equally applying provisions of the ADA causing ineligibility of benefits."

(*Id.*) Plaintiffs seek $2.1 million dollars in damages. (Compl. ¶ 6).

## DISCUSSION

## I.   <u>Oneida DSS</u>

### A.   **Legal Standards**

Departments that are merely administrative arms of a municipality do not have a legal identity separate from the municipality and may not sue or be sued. *Rose v. County of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. Nov. 9, 2012) (citing *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y.2002) (dismissing claim against the police department); *Umhey v. County of Orange*, 957 F. Supp. 525, 530–31 (S.D.N.Y. 1997) (dismissing case against the County Board of Ethics). Therefore,

---

[14] Without explanation, plaintiffs list "Celiac Disease" and "Severe anxiety and depression" as disabilities. (Compl. ¶ 5 (Third Cause of Action)). Because plaintiffs state in another paragraph that Ms. Price is disabled, the court assumes that she suffers from these impairments.

claims asserted under 42 U.S.C. § 1983 will be dismissed against an administrative department or sub-division of a municipality or county. *Id. See also Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999) (because the county sheriff's office was an administrative arm of the county, it was not the appropriate party in a section 1983 action)).

### B.     Application

Plaintiff has named the Oneida County Department of Social Services as a defendant.  As stated above, the "Department" is an administrative arm of the County and may not be sued as an entity under section 1983.  Thus, the court will recommend dismissal of Oneida County DSS as a defendant.  However, in the appropriate circumstances, section 1983 plaintiffs may sue a municipality such as Oneida County. The court will discuss municipal liability below.

## II.     <u>Oneida County</u>

### A.     Legal Standards

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983.  A municipality may not be held liable solely because it employs a tortfeasor. *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at *3 (E.D.N.Y. Apr. 4, 2014) (citing inter alia *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 36 131 (2010)), (Rep.-Rec*.), adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014).  Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the

injury.  *Monell*, 436 U.S. at 694.

To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation.  *Id*.; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).  Official policy includes the decisions of a government's lawmakers, the acts of policymaking officials, and practices that are so widespread as to "practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted).  Municipal liability may also be shown by establishing that a policymaking official ordered or ratified the employees' actions either expressly or tacitly.  Finally, municipal liability can, under certain circumstances, be based upon a failure to properly train the municipality's employees. *See City of Canton v. Harris*, 489 U.S. 378, 387-90 (1989).

### B.    Application

In this case, plaintiffs have named Lucille Soldado, the Oneida County DSS Commissioner as a defendant.  Claims against municipal employees in their "official capacities" are essentially claims against the municipality. *Henrius v. County of Nassau*, No. 13-CV-1192, 2016 WL 1296215, at *12 (E.D.N.Y. Mar. 31, 2016) (citing inter alia *Greenaway v. County of Nassau*, 97 F. Supp. 3d 225, 239 (E.D.N.Y. 2015)). Although plaintiffs do not specify in what capacity they are naming Commissioner Soldado, the court will assume that they are suing her both in her individual and official capacities.  Because the plaintiffs cannot name the Oneida County DSS as an entity, if plaintiffs wish to sue the municipality, naming Commissioner Soldado in her official capacity accomplishes this.

However, Commissioner Soldado as a "decision maker" is not mentioned anywhere in the body of the complaint, and there is no indication that any of the actions taken by the staff who are named in the complaint were directed or influenced by Commissioner Soldado's policies. Plaintiffs do not allege the Commissioner Soldado ratified or approved on any of the conduct alleged in the complaint. Although plaintiffs state that the defendant DSS engaged in a "pattern and practice" of discriminatory and retaliatory acts, plaintiffs allege only conduct directed at them. Plaintiffs claim that the DSS decisions regarding their benefits were incorrect, but do not specify that such decisions were made based on a policy or policies of DSS. In fact, plaintiffs claim that DSS violated its own Administrative Directive.

At the end of the complaint, plaintiffs state in a conclusory fashion that they believe that everyone "colluded knowingly to engage in activities" that would violate plaintiffs' constitutional equal protection[15] rights, by "collectively working to . . . purge eligible recipients from benefit roles. . . ." (Compl. ¶ 4(v)). However, plaintiffs do not allege that any other similarly situated individuals were removed from the benefit roles pursuant to a County policy. Conclusory allegations do not suffice to allege a constitutional claim. *See Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) (conclusory allegations are insufficient to state a section 1983 claim). Thus, the case may be dismissed as against defendant Soldado in her official capacity as representative of Oneida County. The court will now address any individual liability claims against defendant Soldado.

---

[15] The court will discuss any substantive equal protection claims below.

## III. Personal Involvement

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S.*

*Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of either defendant Soldado or defendant Commissioner of NYSOTDA, Samuel D. Roberts.

## B. Application

### 1. Supervisory Defendants

Plaintiffs are seeking only damages in this action.[16] Plaintiffs' complaint makes absolutely no factual statements about conduct committed by either defendant Soldado or defendant Roberts. There is no indication that either defendant was aware of plaintiffs' case or of any allegedly unconstitutional actions by the Oneida DSS staff. Defendant Roberts is the NYSODTA Commissioner in Albany, and there are no allegations in the complaint that defendant Roberts had any personal contact with plaintiffs or their case. Thus, plaintiffs have not stated a claim against either defendant Soldado or defendant Roberts[17] in her or his personal capacity.

---

[16] Plaintiffs' alleged damages are substantial — $2.1 million dollars — and have no relationship to plaintiff's allegedly lost, delayed, or terminated benefits. The damages asserted are purely compensatory or punative.

[17] While plaintiffs may sue Oneida County by naming defendant Soldado in her official capacity, the same cannot be said for defendant Roberts. Defendant Roberts is the New York State Commissioner of OTDA. Suing defendant Roberts in his official capacity would be tantamount to suing the State of New York. Such a suit for damages is precluded by the Eleventh Amendment. The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). A claim against a state agency is considered a claim against the state and implicates the Eleventh Amendment because the state is the "real" party in

### 2.    Melanie DeFazio, Legal Representative

It is unclear why defendant DeFazio has been named in this action.  Plaintiffs refer to her as a "Legal Representative," with no explanation of to what that term refers. In addition, there are absolutely no factual statements in the complaint or in the causes of action which refer to Ms. DeFazio.  There is no conduct alleged by this defendant, and therefore, no claim stated against her for any constitutional or statutory violation. A pleading must contain facts, demonstrating the specific involvement of each defendant in the constitutional deprivations, "alleged in sufficient detail to establish that they were tangibly connected to those deprivations." *Brewer v. Herald*, No. 3:14-CV-958, 2015 WL 2249981, at *6 (N.D.N.Y. May 13, 2015) (citing *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)), (Rep. Rec.), *adopted* 2015 WL 2249981, at *1-2 (N.D.N.Y. May 13, 2015).  Because plaintiffs in this action do not mention Ms. DeFazio or allege that she engaged in any conduct at all, the complaint may be dismissed in its entirety as to Ms. DeFazio.

## IV.    <u>Verbal or Other Harassment</u>

### A.    Legal Standards

Verbal harassment, and even threats, no matter how unprofessional, do not rise to the level of constitutional violations. *Holland v. Morgenstern*, No. 12-CV-4870, 2013

---

interest. Id. at 101.  The Eleventh Amendment also bars suits against state agencies and state officers in their official capacities. *See Huang v. Johnson*, 251 F.3d 65, 70 (2d Cir. 2001).  When the state or one of its "arms" is the defendant, sovereign immunity bars federal courts from entertaining law suits against them "regardless of the nature of the relief sought." *Penhurst*, 465 U.S. at 100.  The Eleventh Amendment is not abrogated by section 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

WL 2237550 (E.D.N.Y. May 20, 2013) (citing *Jean–Laurent v. Wilkerson*, 438 F. Supp.2d 318, 324–25 (S.D.N.Y. 2006) (claim of verbal abuse not cognizable under § 1983 because verbal intimidation did not rise to the level of a constitutional violation); *Ramirez v. Holmes*, 921 F. Supp. 204, 210 (S.D.N.Y. 1996) (threats and verbal harassment without physical injury or damage not cognizable in claim filed under section 1983); *Fairchild, Arabatzis & Smith, Inc. v. Sackhheim*, 451 F. Supp. 1189, 1192 (S.D.N.Y.1978) ("screaming" and "demanding" did not rise to the level of constitutional violation)). *See also Weinstein v. Garden City Union Free School Dist.*, No. CV 11-2509, 2013 WL 55077153, at *16 (E.D.N.Y. Sept. 30, 2013) (citing inter alia *Cole v. Fischer,* 379 F. App'x 40, 43 (2d Cir. 2010); *Curcio v. Roosevelt Union Free School Dist.*, No. 10-CV-5612, 2012 WL 3646935, at *18 (E.D.N.Y. Aug. 22, 2012)).

## B.  Application

Plaintiffs allege that they were treated badly at DSS.  They allege verbal harassment by employees, and they claim that when one of them had a "panic attack," an employee called the Sheriff to escort them out of the building.  When the officers arrived, the DSS staff would not let plaintiffs file a complaint, and the officers made inappropriate jokes and remarks about plaintiffs as they were being "forced" into the elevator.  The officers apparently frightened plaintiffs by placing their hands on their guns while they were trying to get plaintiffs out of the DSS office.

The court would first point out that plaintiffs have not named any of the individuals who they allege harassed them verbally, and they have also failed to name

17

any of the Sheriffs who allegedly told inappropriate jokes about their race. None of the named defendants were personally involved in the "harassment."[18] Even if plaintiffs had sued the individuals who they believed were responsible for "harassment," plaintiffs' allegations would not state a claim under section 1983. The fact that a staff member falsely accused plaintiffs of being rude does not rise to the level of a constitutional claim. Thus, plaintiffs' harassment claims may be dismissed with prejudice.

## V.  **Defamation**

### A.  **Legal Standards**

It is well-settled that damage to one's reputation does not rise to the level of a constitutional violation. *Lawson v. County*, No. 3:14-CV-195, 2016 WL 427896, at *7 (N.D.N.Y. Feb. 3, 2016) (citing *Paul v. Davis*, 424 U.S. 693, 711-12 (1976); *McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 3-4 (2d Cir. 2013)). "'Mere defamation by the government does not deprive a person of liberty protected by the Fourteenth Amendment, even when it causes serious impairments of one's future employment.'" *Id.* (quoting *Hojnacki v. Klein Acosta*, 285 F.3d 544, 548 (7th Cir. 2002)). Only when there is such an "alteration of legal status" together with the injury resulting from the defamation is a liberty interest affected, justifying procedural safeguards. *Id.* (citing *Paul*, 424 U.S. at 708-709).

---

[18] To the extent that plaintiffs actually name individuals who were rude to them, those individuals are not named defendants.

## B.    Application

It is difficult to find any instances in the complaint where plaintiffs discuss their reputations or any alleged "defamation" committed by any of the defendants because plaintiffs do not specify how they were defamed or allege any injury based on a damaged reputation.  However, because plaintiffs' first cause of action states that they were deprived of the "liberty interest" in their good name and reputation, the court will address the claim. (*See* Compl. ¶ 5 – First Cause of Action).

The only factual allegations that could be related to defamation are that one staff member filed a false report, calling plaintiffs rude.  Other facts that could be associated with "reputation" are plaintiffs' statements that DSS was late in paying their rent, and they were forced to appear at DSS with their landlord, who still did not receive his money in a timely manner.  Finally, the plaintiffs could be referring to a non-defendant calling the police and having plaintiffs escorted out of the office and threatened with arrest if they returned to DSS. (Compl. ¶ 4(m)).  Even if any of these allegations could be related to "defamation," none of them rise to the level of deprivation that would create a liberty interest protected by the constitution.  Thus, plaintiffs' first cause of action may be dismissed with prejudice to the extent that it seeks damages based on defamation.[19]

---

[19] In a smaller font underneath the cause of action for defamation, plaintiffs state that they will "seek damages for racial discrimination as plaintiffs have been treated differently than other races." (Compl. ¶ 5).  While racial discrimination may be a viable claim in general, plaintiffs have not stated anywhere in the complaint what race they are and how they were treated differently than "other races." Such a conclusory allegation is insufficient to state an constitutional claim.  Elsewhere in the complaint, they allege that they have been discriminated against because of their handicap(s), but never make any claim about race.  Thus, to the extent plaintiffs are alleging racial discrimination, the cause of

## VI.   ADA and RA

### A.   Legal Standards

In order to state a claim under section 504 of the Rehabilitation Act, the plaintiffs must show that they (1) have a disability for purposes of the Act; (2) that they were "otherwise qualified" for a benefit that they were denied; (3) that they were denied the benefit solely because of their disabilities; and (4) that the benefit is part of a program or activity that receives federal financial assistance. *Romano v. SLS Residential, Inc.* 246 F.R.D. 432, 440 (S.D.N.Y. 2007). Under Title II of the ADA, the plaintiffs must establish that they (1) are qualified individuals with a disability(ies); (2) the defendant is subject to the ADA; and (3) plaintiffs were denied the opportunity to either participate in, or to benefit from the defendants' services, programs, or activities or were otherwise discriminated against because of plaintiffs' disabilities. *United Spinal Ass'n v. Bd. of Elections in City of New York*, 882 F. Supp. 2d 615, 623 (S.D.N.Y. 2012) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)).

### B.   Application

Plaintiffs second and third causes of action appear to be based on the ADA and RA. In the second cause of action, plaintiffs allege that both statutes are violated because of the defendants' "pattern and practice of discriminatory and retaliatory acts and omissions." (Compl. ¶ 5). Plaintiff Prince states that she is disabled within the meaning of the "act" and that her "request for accommodations constitutes protected

---

action may be dismissed without prejudice to plaintiffs amending their complaint to state the claim properly.

activity." (*Id.*)   While these statements indicate that plaintiff Prince may meet some of the requirements for stating a claim under the ADA and RA, the complaint does not indicate how the plaintiffs were prevented from participating in the defendants program "because of their disabilities."  Plaintiffs also mention "reasonable accommodations," but they do not allege what reasonable accommodations they requested, how they were denied, and how the accommodation would have helped them qualify for, or enjoy the benefits of, defendants' program.

In the body of the complaint, plaintiffs state that, at the December 31, 2014 hearing, defendant Kirley was under the mistaken impression that "the higher level of allowance for a family with a person with a disability would not apply . . . ." (Compl. ¶ 4(g)).  Plaintiffs state that a decision was rendered after the fair hearing, and they filed an Article 78 proceeding to challenge the decision. (*Id.*)  Plaintiffs also state that on January 2, 2015, "Judy" told them that she would no longer provide "accommodations" to plaintiffs, and that defendant Kirley should never have provided these accommodations in the past. (Compl. ¶ 4(i)).  Plaintiffs do not allege what these accommodations were.

However, plaintiffs do not sufficiently allege that the were denied participation in the program because of their disabilities.  The fact that defendant Kirley miscalculated the plaintiffs' income allowance because he did not believe that the "higher level" of allowance applied to plaintiffs is not a denial of participation in the program because of plaintiff Prince's handicap(s).  It is an arguably incorrect decision, which the plaintiffs

state that they appealed in an Article 78 proceeding.[20]

In plaintiffs' third cause of action, they claim that defendants "violated" Administrative Directive 06-ADM-05 and Title II of the ADA. (Compl. ¶ 5 – Third Cause of Action). Directive 06-ADM-05 is twenty pages long and is addressed to Local District Commissioners. The "Subject" of the directive is "Providing Access to Temporary Assistance Programs for Persons with Disabilities and/or Limited English Proficiency." The directive covers a multitude of subjects, including making the DSS Office "accessible" to those with disabilities. Plaintiffs do not specify any part of this directive that they believe was violated by the defendants.

The court has read the directive, and the closest provisions that could possibly apply to plaintiffs' claims involve telling the "Districts" to make sure that qualified persons with a disability have an "opportunity" to "participate in, or benefit from, a district's benefits, programs, and services." Directive 06-ADM-05 § 2(1) -2(V). However, plaintiffs do not allege which part of this lengthy directive was violated by any of the named defendants.

Additionally, although plaintiffs say they were denied "reasonable accommodations," they do not indicate what accommodations they asked for, and what accommodations they were given, in the past by defendant Kirley. Thus, plaintiffs have not stated a claim under the ADA or under the RA. They also do not state how they were singled out for different treatment or how others were treated differently. Thus,

---

[20] Plaintiffs have not indicated the outcome of the Article 78 proceeding which they say they filed on May 20, 2015.

plaintiffs' ADA and RA claims may be dismissed.  However, the court will also consider plaintiffs' "retaliation" claim under the ADA as well as under the constitution.

## VII.  Retaliation

### A.    Legal Standards

#### 1.    ADA

ADA retaliation claims are governed by Title V of the ADA which provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 28 U.S.C. § 12203(a).  It is also unlawful to interfere, coerce, intimidate, threaten, or interfere with any individual in the exercise of his or her rights under the act. 42 U.S.C. § 12203(b).  To state a claim for retaliation under the ADA, plaintiff Prince must show that she engaged in a protected activity under the ADA, the defendants were aware of the activity, the defendant took adverse action against plaintiff, and there was a causal connection between the protected activity and the alleged adverse action. *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

#### 2.    First Amendment

In order to state a claim for retaliation under the First Amendment, the plaintiff must show first, that she engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against her by defendant.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003).  Conclusory allegations of retaliation are insufficient to state a claim for relief. *See Reardon v. Keating*, 980 F. Supp. 2d 302, 318 (D. Conn. 2013) (dismissing a retaliation claim

where the complaint's references to retaliation were conclusory, boilerplate, and without foundation or support in the complaint's factual allegations).

## B. Application

### 1. ADA/First Amendment

When plaintiffs write "retaliation" at the end of one of the paragraphs of their complaint, they never actually allege whether they are raising ADA retaliation or First Amendment retaliation, thus, the court will discuss them together. Plaintiffs state that Ms. Prince's "request for accommodations" was "protected activity" under the act. (Compl. ¶ 5 – Second Cause of Action). However, as stated above, plaintiffs do not state what the requested "accommodations" were or what defendants did to "retaliate" against Ms. Prince for this alleged request.

Plaintiffs do allege that when they requested a fair hearing in February of 2015, "OTDA attempted" to have the hearing in Fulton County, instead of in Oneida County, which was the plaintiffs' county of residence. (Compl. ¶ 4(l)). Plaintiffs state that this was "retaliation" for the number of hearings plaintiff requested and was also "negligence." First, the fair hearings requested were not in conjunction with the ADA, they involved public assistance benefits. In any event, these allegations do not support a claim for retaliation under the ADA. Even assuming that plaintiffs' request for fair hearing were somehow conduct protected by the ADA, plaintiffs claim is that OTDA "attempted" to hold a hearing in an inconvenient or incorrect location. There is no indication that the hearing was actually held in the wrong county, and if it was, there is no indication that this action was motivated in any way by plaintiffs' multiple requests

for fair hearings.

To the extent that plaintiffs claim that OTDA's attempt to have a fair hearing in the wrong county is "adverse action," plaintiff's claim cannot succeed under the First Amendment. Nor, as stated above, is there any indication that plaintiffs' multiple request for fair hearings was the "motivating" factor for OTDA's attempt to have one of those hearings in the wrong county. Plaintiffs also allege that one of the HEAP staff, who is not a defendant,[21] made a false report, stating that plaintiffs were "rude." (Compl. ¶ 4(o)). The last word of the paragraph is simply "Retaliation." Plaintiffs do not allege any adverse action as a result of this allegedly false report, and their conclusion that this conduct is somehow "retaliation" simply does not state a claim under either the ADA or the First Amendment.

Although plaintiffs also allege that Ms. Prince's request for accommodations was "constitutionally protected conduct," there is no indication that any adverse action was taken "because of" that conduct. Plaintiffs might be claiming that they were denied benefits in spite of Ms. Prince's claim that she needed some sort of "accommodation," but her request was not the "reason" for the denial. Thus, any claims of retaliation may be dismissed with prejudice.

## VIII. <u>Due Process</u>

### A. **Legal Standards**

In order to state a due process claim, plaintiffs must demonstrate that they have a

---

[21] The fact that this individual is not named as a defendant is an additional reason to dismiss the retaliation claim, because clearly, the conduct alleged applies only to that individual.

"'protected liberty or property interest,'" and that they were "'deprived of that interest without due process.'" *McCluskey v. Comm'r of Nassau Cty. Dep't of Soc. Svcs.*, No. 12-CV-3852, 2013 WL 478094, at *12 (E.D.N.Y. Sept. 5, 2013) (citing inter alia *Banks v. Human Resources Admin.*, No. 11 Civ. 2380, 2013 WL 142347 (E.D.N.Y. Jan. 11, 2013) (quoting *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998)) (Rep.-Rec. dtd. July 23, 2013), *adopted*, 2013 WL 4780954 at *1-4 (E.D.N.Y. Sept. 5, 2013). The due process clause does not guarantee any particular form of procedure, it protects substantive rights. *Id.* (citations omitted). As long as plaintiffs have been afforded the opportunity to be heard at a meaningful time, and in a meaningful manner, their due process rights have not been violated. *Id.* (citations omitted)

## B.    Application

Although plaintiffs do not mention "due process" in their causes of action, some of the "factual" paragraphs of the complaint allege that their due process rights were violated. (Compl. ¶¶ 4(d), (4)(h)). Plaintiffs allege that they were denied "due process" when DSS canceled their "Medical benefits" on November 5, 2014 while the benefits were supposed to be continuing until the fair hearing decision.[22] (Compl. ¶ 4(d)). Plaintiffs claim that their due process rights were violated when their SNAP benefits were "canceled/delayed" for the months of December, 2014 and January, 2015, even though their aid was suppose to "continue," pending the fair hearing decision. (Compl. ¶ 4(h)). Plaintiffs allege that their due process rights were violated when DSS took

---

[22] The court assumes that the fair hearing decision to which plaintiffs refer in this paragraph relates to the August 2014 termination of "public assistance" which plaintiffs allege was based on the "wrong values." (Compl. ¶ 4(a)).

action "prematurely" to deduct an "overpayment recoupment" from their benefits prior to the hearing decision being rendered on the December 31, 2014 fair hearing.

It is well-settled that plaintiffs have a property interest in their government benefits which is protected by due process. *Banks v. Human Resources Admin.*, No. 11-CV-2380, 2013 WL 142374, at *2 (E.D.N.Y. Jan. 11, 2013) (citing *Goldberg v. Kelly*, 397 U.S. 254, 261-62 (1970)). *See also Davis v. Proud*, 2 F. Supp. 3d 460, 484 (E.D.N.Y. 2014) ("'Social welfare benefits,' such as SNAP, 'have long been afforded constitutional protection as a species of property protected by the federal Due Process Clause.'"). After determining that a protected interest exists, then the court must determine what process is due, determine what process the state provided, and whether it was constitutionally adequate. *Davis*, 2 F. Supp. 2d at 484-85 (quoting *Rivera Powell v. N.Y. City Bd. of Elecs.*, 470 F.3d 458, 465 (2d Cir. 2006)).

The fundamental requirements of due process are notice and an opportunity to be heard in a meaningful time and a meaningful manner. *Davis*, 2 F. Supp. 3d at 485 (citing inter alia *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985)). Notice of benefit determinations must provide claimants with enough information to understand the reasons for the agency's action, so that they may defend the impending termination. *Id.* (citing inter alia *Kapps v. Wing*, 404 F.3d 105, 123-24 (2d Cir. 2005)). With respect to the opportunity to be heard in conjunction with government entitlement benefits, "access to post-deprivation process is adequate to meet the requirements of constitutional due process." *McCluskey*, 2013 WL 478094, at *12 (citing *Vapne v. Eggleston*, No. 04 Civ. 565, 2004 WL 2754673 (S.D.N.Y. Dec. 1, 2004)).

In circumstances involving "random acts, unauthorized acts by governmental employees, due process is not violated if the state provides a meaningful post deprivation procedure. *Colondres v. Scopetta*, 290 F. Supp. 2d 376, 383 (E.D.N.Y. 2003) (citation omitted). However, "'[w]hen the deprivation occurs in the "more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not ipso facto satisfy due process.'" *Id.* (quoting *Hellenic*, 101 F.3d at 880). In *Colondres*, the court held that "the constitutionality of Article 78 proceedings, as a post-deprivation remedy, is often contingent upon the nature of the deprivation – i.e., whether it was based on an unauthorized act by a state employee or an established state procedure. *Id.*

Plaintiffs in this case find fault with much of the conduct of DSS employees, but never really challenge the substance of the notice they received or the opportunity to be heard. They complain that a variety[23] of benefits were terminated, but it is unclear why they believe their due process rights were violated. It also appears that the plaintiffs were afforded a fair hearing and the opportunity to file a post-deprivation Article 78 proceeding relative to the August 2014 termination of "public assistance," which

---

[23] Plaintiffs refer to "public assistance," "medical benefits," SNAP benefits, and HEAP benefits, all of which appear to be different. Certainly, medical benefits, SNAP benefits, and HEAP benefits are different. SNAP, previously known as the Food Stamp Program, is a federal benefits program that enables qualified households or "beneficiaries" to purchase food items at participating stores. See 7 U.S.C. §§ 2011, 2013(a); 7 C.F.R. § 278.1. As stated above, HEAP refers to Home Energy Assistance Program. *Kapps v. Wing*, 404 F.3d at 108. Neither SNAP, nor HEAP refers to medical benefits.

hearing was not actually held until December 31, 2014.[24]  In fact, plaintiffs allege that

they filed an Article 78 petition on May 20, 2015, after the December 31, 2014

"decision was rendered," but do not indicate the result of the Article 78 petition.[25]

(Compl. ¶ 4(g)).

Unfortunately, plaintiffs' complaint is so disjointed that it is difficult to

determine whether they have any causes of action for due process violations,

particularly because they do not include "due process" in their causes of action, and the

court is attempting to parse through the allegations in the complaint to determine

whether any viable claims exist.

There are two instances where plaintiffs allege a due process violation in which

plaintiffs may ultimately state a claim if they clarify their factual statements.  Plaintiffs

allege that their SNAP benefits were prematurely "canceled/delayed" in violation of an

"aid to continue" directive, prior to the fair hearing decision. (Compl. ¶ 4(h)).  In *Morel*

*v. Giuliani*, 927 F. Supp. 622, 635 (S.D.N.Y. 1995), the district court discussed the

immediate and irreparable harm in the denial of "aid continuing benefits." *Id.*

(discussing the issue in the context of a preliminary injunction motion).  However, in

---

[24] In fact, plaintiffs allege that this hearing was originally scheduled for December 20, 2014, but was adjourned because plaintiffs had not been afforded access to their case file prior to the hearing. (Compl. ¶ 4(f)).  The hearing was held on December 31, 2014 "after access to files granted." (Compl. ¶ 4(g)).  Plaintiffs state that although they agreed with DSS's income determination, they believed that they should have been entitled to a "higher level of allowance" because one of the plaintiffs is disabled. Plaintiffs were clearly aware of the issues, they disagreed with the DSS decision and apparently appealed the adverse determination.

[25] The court can only assume that the December 31, 2014 decision was relative to the August 2014 termination of "public assistance" benefits which plaintiffs claim was made "using [the] wrong values to determine eligibility. (Compl. ¶¶ 4(a), 4(g)).

this case, plaintiffs do not allege when the cancellation or delay occurred and to which fair hearing they are referring.

In addition, a "delay" is not a termination, and thus, "canceling" or "delaying" may have different effects, depending on how long the delay continued. It is the first time that they mention SNAP benefits in the complaint, and because plaintiffs have not listed a date, it is unclear whether any hearing was pending at the time that the benefits were "canceled/delayed." In addition, later in their complaint, they allege that DSS was recouping the alleged overpayment by deductions from plaintiffs SNAP benefits between March 29, 2015 and June 2015, indicating that plaintiffs' SNAP benefits were not "terminated" in December and January. (*Compare* Compl. ¶ 4(h) *with* Compl. ¶ 4(s)).

Plaintiffs also allege that their "Medical" benefits were "canceled" on November 5, 2014 in violation of an "aid to continue" directive. (Compl. ¶ 4(d)). The fact that they were on an "aid to continue" status may indicate that the cancellation of their benefits was a "random and unauthorized act." It appears that the plaintiffs' "aid to continue" was relative to the August 2014 decision to terminate "public assistance." Unfortunately, there are no supporting facts other than this conclusory statement, and the fair hearing that was pending on November 5, 2014 appears unrelated to plaintiffs' medical benefits. However, as discussed below, this court will recommend that plaintiffs be allowed to file a proposed amended complaint which clarifies potential due process claims.

## IX. Equal Protection

### A. Legal Standards

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

### B. Application

To the extent that plaintiffs are attempting to raise a constitutional equal protection claim, they would have to allege that defendants treated them differently than others who were "similarly situated." Although plaintiffs make conclusory statements that they were treated differently, they have pointed to no specific instance in which some other applicant or applicants, who were similarly-situated to plaintiffs were treated differently that they were treated.

## X. Negligence

### A. Legal Standards

It is well settled that negligence is not actionable under section 1983. *Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986). Deprivation of property by a random and unauthorized act of a state or federal employee (negligent or intentional) does not constitute a deprivation of due process if a meaningful post-deprivation remedy exists. *Wooten v. New York City Human Resources Admin.*, 421 F. Supp. 2d 737, 740 (S.D.N.Y. 2006) (citing *Stuto v. Fleishman*, 164 F.3d 820, 825 (2d Cir. 1999); *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 156 (2d Cir.

2006); *Locurto v. Safir*, 264 F.3d 154, 172 (2d Cir. 2001).

### B. Application

Throughout the complaint, plaintiffs allege that DSS employees were "negligent" or engaged in "misconduct." (Compl. ¶¶ 4(c)(falsified records); 4(j) (defendant did not comply with orders of fair hearing officer – negligence); 4(l) (scheduled hearing in the wrong county); 4(q) (sending out faulty notice which had to be withdrawn)). To the extent plaintiffs allege "misconduct" or "negligence" by the staff of DSS, they do not state a claim for relief.

## XI. Fraud

### A. Legal Standards

A cause of action for fraud, whether under federal or state law, must be pled with particularity. *Petrello v. White*, 412 F. Supp. 2d 215, 226-27 (E.D.N.Y. 2006) (citing *Kaufman v. Cohen*, 307 A.D.2d 113 (1st Dep't 2003)). In order to establish "fraud in the inducement," plaintiffs must show that defendants (1) made a material misreprsentation; (2) as to a material existing fact; (3) which was false; (4) and known to be false by defendants; (5) for the purpose of inducing plaintiffs to rely on the falsehood; (6) plaintiffs reasonably relied upon it; (7) without knowledge of its falsehood; (8) to their injury. *Id.* at 227 (citing *Topps Co., Inc. v. Cadbury Stani S.A.I.C.*, 380 F. Supp. 2d 250, 265 (S.D.N.Y. 2005)).

### B. Application

Plaintiffs periodically end the factual paragraphs in their complaint with "Fraud" or "Fraud in the inducement." (Compl. ¶¶ 4(e), 4(g), 4(i), 4(s), 4(u)). Plaintiffs do not

explain why they allege that defendants committed these "frauds." Plaintiffs seem to claim that every time that a DSS employee told them something that was allegedly not true, they committed fraud or fraud in the inducement. In paragraph 4(g), plaintiffs allege that during the December 31, 2014 fair hearing, they "agreed" to the defendants' calculated income determination, but because defendant Kirley was under the "false impression" that the higher level of allowance did not apply to the plaintiffs, they were found not to be eligible for benefits. Plaintiffs claim that this shows "fraud in the inducement." Even assuming that the other factors were present, defendant Kirley's "false impression" does not constitute fraud. In fact, plaintiffs' statement implies that defendant Kirley thought he was correct in his assumption, even though plaintiffs allege that it was false.

In paragraph 4(i), plaintiffs allege that "Judy" stated that she would no longer provide accommodations to plaintiffs and that defendant Kirley should not have allowed these "accommodations" in the past. Then, Judy refused to give plaintiffs an ADA Grievance Form, telling plaintiffs they could file a grievance on blank paper, and it would be delivered to the appropriate department. Plaintiffs claim that they never got a response, so they assume that Judy committed official misconduct and fraud. Even if Judy were named as a defendant, these allegations do not state a claim for fraud. The same applies to all the instances in which plaintiffs allege fraud.

## XII. <u>Opportunity to Amend</u>

### A. **Legal Standards**

Generally, before the court dismisses a pro se complaint or any part of the

complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

## B.    Application

The court first notes that plaintiffs may not sue NYSOTDA or Commissioner Roberts in his official capacity for the damages that they seek, because such claims would be barred by the Eleventh Amendment. Thus, any amended complaint may not name either of those defendants. Plaintiffs could have named Commissioner Roberts in his individual capacity, but they have not alleged that he was personally involved in any of the claims that they have raised, thus, the entire complaint may be dismissed as against Commissioner Roberts in either his personal or official capacities. Plaintiffs have also stated no facts as against defendant Melanie DeFazio, who they call "Legal Representative." She is not mentioned once in any paragraph or cause of action. The entire complaint may be dismissed without prejudice as to defendant DeFazio.[26]

Although plaintiffs' facts are difficult to understand, plaintiffs may be able to state due process or equal protection claims if they give the court more information about how they believe that these rights were violated as discussed above. For equal

---

[26] If plaintiffs submit a proposed amended complaint, they must indicate for what conduct defendant DeFazio is responsible and how that conduct violated plaintiffs' statutory or constitutional rights.

protection purposes, plaintiffs would have to allege that they were treated differently than other similarly situated individuals and that the differing treatment was based on their disability. For purposes of due process, plaintiffs would have to allege when their benefits were terminated while on "aid to continue" status and whether they received notice and an opportunity to be heard regarding the termination.

The court also finds that plaintiffs could conceivably state a claim under the ADA or the RA against the County if they specified what accommodations they requested which the County did not give them, and how this lack of accommodation prevented them from access to the benefits to which they are allegedly entitled. Plaintiffs should not simply state that defendants violated "the directive" in general.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiffs' motion for IFP status is **GRANTED FOR FILING PURPOSES**, and it is

**RECOMMENDED**, that plaintiffs' complaint be dismissed in its entirety **WITH PREJUDICE**, as to the **ONEIDA COUNTY DEPARTMENT OF SOCIAL SERVICES and SAMUEL D. ROBERTS, COMMISSIONER OF NYSOTDA**, and it is

**RECOMMENDED**, that plaintiff's complaint be **DISMISSED WITHOUT PREJUDICE** as to any **due process, equal protection, and ADA, or RA claims** as discussed above, and it is

**RECOMMENDED**, that plaintiff's complaint be dismissed **WITH PREJUDICE** as to **ALL REMAINING CLAIMS** (defamation, fraud, fraud in the

inducement, negligence, harassment, retaliation, official misconduct, undue burden, breach of contract, and embezzlement claims), and it is

RECOMMENDED, that if the district court approves this recommendation, plaintiffs be given forty-five (45) days within which to amend their complaint as to only the claims that are dismissed without prejudice, against individuals who plaintiffs claim were responsible for the alleged violations, and it is

RECOMMENDED, that if the court approves this recommendation, and plaintiffs fail to file an amended complaint within the appropriate time or request an extension of time to do so, the entire action be dismissed with prejudice, and it is

RECOMMENDED, that if the court approves this recommendation, and plaintiffs file a proposed amended complaint, the proposed amended complaint be returned to me for further proceedings.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: May 5, 2016

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**